Filed 11/19/20  P. v. Gardea CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C078142 |
| Plaintiff and Respondent, | (Super. Ct. No. SF116730A) |
| v. | |
| JAIRUS GARDEA, | |
| Defendant and Appellant. | |

Defendant Jairus Gardea, an admitted gang member, fired five bullets toward farmworkers he believed were members of a competing gang.  A jury afterward convicted defendant—who was 16 years old at the time of the shooting—of attempted murder, gang participation, and child abuse or endangerment.  The jury also found true several enhancements and penalty allegations, including, with respect to the attempted murder charge, that defendant personally and intentionally used a firearm and acted willfully, deliberately, and with premeditation.  The trial court sentenced defendant to 40 years to life in prison.

1

Defendant raises 10 issues on appeal. He contends (1) the evidence was insufficient to support the conviction for attempted murder, (2) the jury's finding that the attempted murder was committed willfully, deliberately, and with premeditation violated the double jeopardy clause, (3) the court wrongly admitted, in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*), his admission to jail and prison staff that he was a gang member, (4) the evidence was insufficient to support the conviction for gang participation, (5) the court wrongly instructed the jury on the gang participation charge, (6) the court wrongly allowed the prosecution's gang expert to relate to the jury case-specific hearsay statements, (7) the case should be remanded, pursuant to Proposition 57, to allow the juvenile court to determine whether the case should remain in juvenile court or be transferred to adult court, (8) the case should be remanded, for the reasons discussed in *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*), to allow defendant to make a record of mitigating evidence relevant to his eventual "youth offender parole hearing" under Penal Code[1] section 3051, (9) the case should be remanded to allow the trial court to exercise its newly granted discretion under section 12022.53 to strike his firearm enhancements, and (10) the court violated his due process rights by ordering him to pay criminal fees and fines without first finding he had the ability to pay these amounts.

We agree reversal is appropriate in part. First, like both parties, we find the double jeopardy clause barred the jury from finding defendant acted willfully, deliberately, and with premeditation. Because the first jury to hear defendant's case rejected that allegation, the jury here could not retry defendant on that same issue. Second, we find defendant's conviction for gang participation was not supported by substantial evidence. To support a conviction on this ground, the prosecution needed to

---

[1]     Undesignated statutory references are to the Penal Code.

2

show at least two gang members participated in the shooting.  But in the end, the prosecution was only able to show one gang member:  Defendant.

We also agree remand is appropriate in light of Proposition 57 and sections 3051 and 12022.53—three laws that became effective after defendant's trial but apply retroactively to nonfinal sentences.  We thus, per Proposition 57, conditionally reverse the judgment on the remaining counts and remand to allow the juvenile court to determine whether this case should remain in juvenile court or be transferred to adult court.  Should the juvenile court find the case should remain within the juvenile justice system, defendant's convictions will be deemed juvenile adjudications.  The juvenile court is then to consider whether to strike or dismiss defendant's firearm enhancements and impose an appropriate disposition within its discretion under juvenile court law.  Should the juvenile court instead transfer the matter to adult court, defendant's convictions will be reinstated.  The court is then to consider whether to strike or dismiss defendant's firearm enhancements and resentence defendant within the bounds of its discretion.  In the event the court sentences defendant to a term that warrants an eventual "youth offender parole hearing," it must evaluate whether defendant had sufficient opportunity in earlier hearings to present mitigating evidence relevant to his eventual youth offender parole hearing; and if the court finds he did not, it must afford defendant an opportunity to provide this type of evidence.

We reject or decline to consider defendant's remaining claims.

3

BACKGROUND

I

*Factual Background*

On January 10, 2011, after pruning grapes in a vineyard, Pedro C., Esteban M., and Alvaro M. drove together from the vineyard to their home in Stockton.[2] Pedro drove and after he parked in their garage, the three farmworkers exited and begun removing their boots.

As they did, three people approached from the sidewalk and questioned whether the farmworkers were Sureño gang members. They also accused Pedro, Esteban, and Alvaro of being "scraps," a derogatory term that Norteño gang members use for Sureño gang members. Although none of the three farmworkers were gang members of any sort, each wore some blue attire at the time—a color associated with the Sureño gang.

After Pedro and Esteban denied being gang members, one of the three accusers drew a gun. As the farmworkers attempted to flee, the shooter fired five bullets toward the garage from a distance of about 26 feet. All five of the bullets struck the back of the car and four entered the car's trunk through the bumper. One of the bullets, however, deflected off the car and struck Alvaro in the head—causing him to suffer brain damage and leaving him, even years later, partially blind and with recurring severe headaches. The shooter and his two companions fled following the shooting.

Two days after the shooting, on January 12, 2011, an investigating officer with the Stockton Police Department visited Pedro and Esteban's home and separately showed each a page of photographs from a school photo directory, which did not include defendant's photo, and a six-person photo array, which did. Pedro recognized no one in

---

**2** To provide a measure of anonymity, we refer to these three by their first names and last initials. (See Cal. Rules of Court, rule 8.90.) For subsequent references, we will use their first names only.

4

the photographs. Esteban also recognized no one in the school photo directory, but when shown the photo array, he pointed to defendant's photograph and identified him as the shooter.

A week later, on January 19, 2011, the same officer returned to Pedro and Esteban's home with a more recent photograph of defendant placed in a new six-person photo array. On being shown the new photo array, Pedro pointed to defendant's photograph and identified him as the shooter. Neither Esteban nor Pedro, however, ever identified defendant's two companions.

Around this time, the Stockton Police Department arrested defendant. Defendant—who was then 16 years old—was booked into juvenile hall. During booking, an officer asked defendant whether he was affiliated with a gang—a question routinely asked inmates to avoid placing them in the same housing with rival gang members. Defendant said he was, the Norteño gang. Defendant then asked the officer about his charges, and after being told, he smiled and giggled. He then said something to the effect of "[i]t's not like he died" or "[i]t's not like I killed him."

At trial, the booking officer related these statements to the jury without objection from defendant's counsel. A gang expert related some of the same, testifying that defendant admitted to being a Norteño gang member during booking. The gang expert also, based on his interviews with several witnesses and his review of certain reports, testified about various other matters tending to show defendant was a Norteño gang member.

II

*Procedural Background*

Defendant was charged as an adult under former Welfare and Institutions Code section 707, subdivision (d)(1) (amended by Prop. 57, approved by voters, Gen. Elec. (Nov. 8, 2016) § 4.2, eff. Nov. 9, 2016). He was charged with four felonies: (1) attempted premeditated murder of Alvaro (§ 664/187, subd. (a)), (2) active participation

5

in a criminal street gang (§ 186.22, subd. (a)), (3) attempted premeditated murder of Esteban (§ 664/187, subd. (a)), and (4) child abuse or endangerment of Alvaro, who, like defendant, was 16 years old at the time of the shooting (§ 273a, subd. (a)).

Defendant was also charged with several enhancements relating to these felonies. The information alleged, with respect to the first attempted murder charge, that defendant (1) personally and intentionally discharged a firearm that caused Alvaro great bodily injury (§ 12022.53, subd. (d)), (2) committed the offense for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)), and (3) was a principal in the offense and at least one principal personally and intentionally discharged a firearm that caused Alvaro great bodily injury (§ 12022.53, subds. (d), (e)). The information similarly alleged, with respect to the second attempted murder charge, that defendant (1) personally and intentionally discharged a firearm in the commission of the felony (§ 12022.53, subd. (c)), (2) committed the offense for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)), and (3) was a principal in the offense and at least one principal personally and intentionally discharged a firearm in the commission of the felony (§ 12022.53, subds. (c), (e)). Finally, with respect to the child abuse charge, the information alleged that defendant (1) personally inflicted great bodily injury to Alvaro (§ 12022.7, subd. (a)), and (2) personally used a firearm in the commission of the felony (§ 12022.5, subd. (a)).

In defendant's first trial, a jury found him guilty of the attempted murder of Alvaro (count 1), gang participation (count 2), and child abuse or endangerment (count 4), but not guilty for the attempted murder of Esteban (count 3). The jury rejected the willful, deliberate, and premeditation allegation to count 1, but found true the gang and firearm enhancements to that count. The jury also found true the firearm and great bodily injury enhancements to count 4.

The trial court afterward granted defendant's motion for a new trial, though its reasons for doing so are unclear from the record. Defendant was subsequently retried on

6

all counts, enhancements, and penalty allegations alleged in the information, apart from those related to the alleged attempted murder of Esteban.

On retrial, a jury again found defendant guilty of the attempted murder of Alvaro, gang participation, and child abuse or endangerment. Like the first jury, the second jury also found true the gang and firearm enhancements to the attempted murder charge and the great bodily injury enhancement to the child abuse charge.[3] But unlike the first jury, the second jury further found defendant's attempt to murder Alvaro was willful, deliberate, and premeditated.

After defendant unsuccessfully moved for a new trial, the court sentenced defendant to state prison for a term of 40 years to life. It imposed a term of 15 years to life for premeditated attempted murder with a gang enhancement (§§ 664/187, subd. (a), 186.22, subd. (b)(1)) and a consecutive term of 25 years to life for one of the firearm enhancements on that count (§ 12022.53, subd. (d)), for a total term of 40 years to life. The court also sentenced defendant to a term of 25 years to life for the related firearm enhancement on that same count (§ 12022.53, subd. (e)), but stayed the sentence per section 12022.5, subdivision (f). The court further sentenced defendant to prison for two years for the gang participation charge, four years for the child abuse charge, and three years for the great bodily injury enhancement to the child abuse charge, but stayed these sentences per section 654. Defendant timely filed this appeal.

DISCUSSION

I

*Sufficiency of the Evidence for the Attempted Murder Charge*

Defendant first contends the evidence is insufficient to support his conviction for attempted murder. As defendant notes, attempted murder is a specific intent crime. It

---

[3] The firearm allegation to the child abuse charge was never submitted to the jury and was ultimately stricken.

requires both "the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Ervine* (2009) 47 Cal.4th 745, 785.) Focusing on the required mental state, defendant contends the evidence is insufficient to support a finding that he acted with the requisite intent to kill Alvaro. We disagree.

To determine if sufficient evidence supports a jury's finding, we must " ' "review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.]' [Citation.]" (*People v. Lee* (2011) 51 Cal.4th 620, 632.) Our job is not to evaluate witness credibility, " 'for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' [Citation.]" (*Ibid.*) Nor is it our job to reweigh the evidence. We instead must resolve all conflicts in the evidence in favor of the judgment's findings, so long as these findings are based on substantial evidence and not speculation, supposition, or conjecture. (*Ibid.*; *People v. Davis* (2013) 57 Cal.4th 353, 360.)

Viewing the evidence under this standard, we find the jury's finding was supported by substantial evidence. Although we find no direct evidence of defendant's intent, we conclude the circumstances of the shooting were sufficient to support an inference that defendant acted with intent to kill.

First, we find the evidence suggested that defendant had a motive for shooting Alvaro. Although not required, evidence of motive is probative of whether someone acts with intent to kill. (*People v. Smith* (2005) 37 Cal.4th 733, 741 (*Smith*).) Defendant was an admitted Norteño gang member, and according to the prosecution's gang expert, Norteño gang members are known to attack those they believe are members of the Sureño gang. They do so, the expert explained, to cause "fear and intimidation"; to "show that

8

they are the toughest gang" and "that nobody from another gang is going to come in and encroach in their area." And this violence at times reaches farmworkers who are not affiliated with any gang. According to the expert, farmworkers wearing blue—the preferred color of the Sureño gang—often have been mistaken as Sureño gang members by Norteño gang members and, as a result, have been assaulted, robbed, and called Sureños and scraps.

Returning to the facts of the case, Pedro, Esteban, and Alvaro all wore some blue attire on the day of the shooting. After the three exited their car on returning home after pruning grapes, defendant and his two companions questioned whether they were Sureño gang members and called them "scraps" and "mother fucker." These circumstances in the moments before the shooting, together with defendant's admission that he was a Norteño gang member, suggested a motive for defendant wanting to shoot Alvaro—and that "in turn was probative of whether he shot . . . with intent to kill." (*Smith*, *supra*, 37 Cal.4th at p. 741 [that the defendant called his ex-girlfriend a "bitch" moments before shooting in her direction "was probative of whether he shot at her with intent to kill"].)

Apart from the evidence of motive, we also find the particular circumstances of the shooting supported an inference that defendant acted with intent to kill. After calling the three farmworkers scraps, defendant drew his gun. From his standpoint, about 26 feet from the farmworkers, the car was to his right and Alvaro and Esteban were immediately right of the car, only inches away. Defendant aimed to his right toward the car, Alvaro, and Esteban, and then fired five bullets in their direction—all five of which struck the car and one of which, after deflecting off the car, struck Alvaro in the head. These facts, taken together with the facts evidencing motive, are sufficient to support an inference that defendant acted with the intent to kill. As the California Supreme Court has explained, "the act of purposefully firing a lethal weapon at another human being at close range, without legal excuse, generally gives rise to an inference that the shooter acted with

9

express malice"—that is, with an intent to kill. (*Smith*, *supra*, 37 Cal.4th at p. 742; see also *id.* at p. 741.)

Defendant, in response, notes that four of the five bullets entered the car's trunk and the fifth ricocheted off the car's trunk, showing—defendant claims—that he "most likely [acted] with the intent to scare or intimidate the three men." All bullets, it is true, appeared to strike the car first. And that is true even of the bullet that struck Alvaro. As the prosecution's ballistics expert suggested, that bullet appeared to ricochet off the car's trunk before striking Alvaro. But we cannot say these facts necessarily show defendant intended to strike the car. Had defendant fired from a distance of two feet, we might in that case be compelled to agree with his position. A reasonable juror in that scenario might have to find that defendant struck the car on purpose rather than because of poor marksmanship. But given defendant's distance of 26 feet at the time of the shooting—close but not point blank—and given the close proximity between the car and Alvaro—a matter of inches—we cannot say the same under the facts here. (See *Smith*, *supra*, 37 Cal.4th at p. 736 [" 'The act of firing toward a victim at a close, but not point blank, range "in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill." [Citation.]' "].)

In sum, after viewing the evidence in the light most favorable to the prosecution, we find sufficient evidence in the record to support the jury's finding that defendant acted with the requisite intent to kill. (See *Smith*, *supra*, 37 Cal.4th at pp. 742-743 [affirming jury's finding that the defendant who fired a single bullet into a slowly moving car had the intent to kill two of the car's occupants]; *People v. Chinchilla* (1997) 52 Cal.App.4th 683, 691 ["Where a defendant fires at two officers, one of whom is crouched in front of the other, the defendant endangers the lives of both officers and a reasonable jury could infer from this that the defendant intended to kill both."].)

10

## II

### *Double Jeopardy*

Defendant next contends he received ineffective assistance of counsel when his trial counsel forfeited his double jeopardy claim concerning whether his attempt to murder Alvaro was willful, deliberate, and premeditated—something the first jury found not true but the second jury found true. The Attorney General agrees defendant received ineffective assistance of counsel in this regard. So do we.

At the outset, we address whether defendant forfeited the double jeopardy issue. We find he did, at least "technically." A defendant who fails to raise a double jeopardy defense at the trial level "technically" forfeits the defense on appeal. (*People v. Williams* (1999) 21 Cal.4th 335, 343-344.) But although technically forfeited, courts will still consider "the double jeopardy claim on the merits indirectly through a claim of ineffective assistance of counsel." (*Id.* at p. 344.) We thus do so here.

The Fifth Amendment of the United States Constitution provides that "[n]o person shall . . . be subject for the same offence to be twice put in jeopardy of life or limb. . . ." (U.S. Const., 5th Amend.) It prohibits a second prosecution for the same offense following a verdict. (*Schiro v. Farley* (1994) 510 U.S. 222, 229.) It also prohibits second prosecutions for enhancements and penalty allegations related to a charged offense. In *People v. Superior Court (Marks)* (1991) 1 Cal.4th 56, for example, the California Supreme Court found the double jeopardy clause barred retrial of a sentencing enhancement that an earlier jury had found not true. That earlier jury found the defendant guilty of murder and conspiracy to commit murder, but found not true, among other things, the prosecution's allegation that he personally used a firearm to commit the murder. (*Id.* at p. 62, fn. 3.) That conviction, however, was ultimately set aside. (*Id.* at p. 62.) Considering the potential scope of the defendant's second trial, the court found the first jury's rejection of the firearm allegation "constituted an express acquittal on the enhancement and foreclose[d] any retrial" on that issue. (*Id.* at p. 78, fn. 22; see also

*People v. Santamaria* (1994) 8 Cal.4th 903, 910; *People v. Pettaway* (1988) 206 Cal.App.3d 1312, 1331-1332.)

Applying the same reasoning, we find the first jury's rejection of the allegation that defendant acted willfully, deliberately, and with premeditation constituted an express acquittal on the allegation and foreclosed any retrial on that issue. (See *Marks*, *supra*, 1 Cal.4th at p. 78, fn. 22.) Because defendant was nonetheless retried on that allegation, we find the retrial on the issue violated the double jeopardy clause. We thus set aside the jury's finding that defendant acted willfully, deliberately, and with premeditation. (See *People v. Trujeque* (2015) 61 Cal.4th 227, 253; *People v. Belcher* (1974) 11 Cal.3d 91, 101 [defense counsel's failure to assert a "crucial" defense that would have defeated one of the prosecution's counts denied the defendant his right to effective assistance of counsel and warranted reversal on that count].)

III

*Defendant's Gang Membership Admissions*

Defendant next contends the court erred in admitting his statement to a juvenile hall booking officer that he was a Norteño gang member, which he made after the officer asked about his gang status. Defendant also contends the court erred in admitting his similar statement made to prison classification staff, who also asked about his gang status when he was transferred to adult custody. Both statements, he alleges, were inadmissible under *Miranda, supra*, 384 U.S. 436. The Attorney General concedes these statements were admitted in violation of *Miranda*, but asserts that defendant forfeited the issue by failing to raise it at trial.

To begin, we agree with the parties that admission of defendant's statements violated *Miranda*. The self-incrimination clause of the Fifth Amendment provides that no "person . . . shall be compelled in any criminal case to be a witness against himself." (U.S. Const., 5th Amend.) To protect a suspect's right against self-incrimination, the United States Supreme Court in *Miranda*, *supra*, 384 U.S. 436, held that "the prosecution

12

may not use statements, whether exculpatory or inculpatory, stemming from *custodial interrogation* of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." (*Id.* at p. 444, italics added.) As the court's later opinions have explained, police officers conduct a "custodial interrogation" when, after taking a suspect into custody or " 'otherwise depriv[ing] [that person] of his freedom of action in any significant way,' " they say any words or take any actions "(other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (*Rhode Island v. Innis* (1980) 446 U.S. 291, 298, 301.)[4]

Applying these principles in an opinion issued two years after the trial here, the California Supreme Court found that a booking officer's questions about a defendant's gang affiliation is a "custodial interrogation" for *Miranda* purposes. (*People v. Elizalde* (2015) 61 Cal.4th 523, 535-536 (*Elizalde*).) Officers should know, the court explained, that questions of this sort are "reasonably likely to elicit an incriminating response" from the defendant. (*Id.* at p. 538.) And that remains true regardless of the officer's intent in asking the question. (*Id.* at p. 536.) For that reason, unless a defendant has been admonished per *Miranda*, the defendant's responses to questions about his or her gang status are inadmissible at trial. (*Elizalde,* at p. 535.)

Following the *Elizalde* court's reasoning, we find defendant's unadmonished answers in response to questions about his gang affiliation were inadmissible at trial.

But although we agree these statements should have been excluded, we find the issue has not been preserved for appeal. As defendant acknowledges, his trial counsel

---

[4]     Before conducting an interrogation of this type, the police must, per *Miranda*, provide the familiar admonitions that you have the right to remain silent, anything you say can be used against you in a court of law, you have the right to an attorney, and if you cannot afford an attorney, one will be appointed for you before any questioning should you desire. (*Miranda*, *supra*, 384 U.S. at p. 479.)

13

never objected to the admission of these statements. Although we are "generally not prohibited from reaching a question that has not been preserved for review by a party," the same is not true "when the issue involves the admission (Evid. Code, § 353) or exclusion (*id.*, § 354) of evidence." (*People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6.) Under those circumstances, with one exception, we are barred from considering an evidentiary issue that was not raised at trial (*ibid.*)—and that is true even if it involves the admission of evidence in violation of *Miranda* (*People v. Haskett* (1990) 52 Cal.3d 210, 243). The only exception to that bar is if the party's objection at the trial level would have been futile. (See *People v. Cage* (2015) 62 Cal.4th 256, 282.)

Relying on this futility exception, defendant contends his *Miranda* claims have not been forfeited because an objection at the trial level would have been futile in light of the substantive law at the time of his trial. We disagree. It is true, as defendant notes, that the *Elizalde* decision was not issued until after his trial. And it is also true that, at the time of trial, one court believed answers to these and other booking questions were admissible unless asked as a "pretext for eliciting incriminating information." (*People v. Gomez* (2011) 192 Cal.App.4th 609, 630-631, overruled by *Elizalde*, *supra*, 61 Cal.4th 523.) But at least one other court at the time of trial disagreed. (See *People v. Morris* (1987) 192 Cal.App.3d 380, 389-390 (*Morris*), disapproved of on other grounds in *People v. Williams* (2013) 56 Cal.4th 165, 188, fn. 15.) According to the court in *Morris*, "[t]he police may ask whatever the needs of jail security dictate" during booking; but "when the police know or should know that such an inquiry is reasonably likely to elicit an incriminating response from the suspect, the suspect's responses are not admissible

14

against him in a subsequent criminal proceeding unless the initial inquiry has been preceded by *Miranda* admonishments." (*Ibid.*)[5]

At the time of trial then, the Courts of Appeal were divided about the relevant standard for reviewing the admissibility of responses to booking questions. One thought these responses admissible, even absent a *Miranda* warning, unless the question was asked as a "pretext for eliciting incriminating information" (*People v. Gomez, supra*, 192 Cal.App.4th at pp. 630-631); another believed these same responses inadmissible if "the police kn[e]w or should [have] know[n] that such an inquiry [wa]s reasonably likely to elicit an incriminating response" (*Morris, supra*, 192 Cal.App.3d at pp. 389-390).

Because defendant could have successfully objected under the reasoning of one of these courts, *Morris*, we cannot find that his *Miranda* objection would have been futile. To be sure, had defendant's counsel objected, the trial court very well could have rejected the objection under the *Gomez* court's logic. But the court also could have instead decided to follow *Morris* and excluded defendant's statements under that court's reasoning. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 456 [when Courts of Appeal conflict, "the court exercising inferior jurisdiction can and must make a choice between the conflicting decisions"].) Defendant's counsel never objected, however; and because we are not persuaded an objection would have been futile, we cannot now consider his forfeited *Miranda* claim on appeal. (*People v. Cage, supra*, 62 Cal.4th at p. 282.)

---

[5] Although the California Supreme Court in *People v. Williams, supra*, 56 Cal.4th at page 188, footnote 15 disapproved of *Morris* in some respects, it "did not criticize *Morris*'s statement of the law." (*Elizalde, supra*, 61 Cal.4th at p. 538.)

IV

*Sufficiency of the Evidence for the Gang Participation Charge*

Defendant next claims the evidence is insufficient to support a finding that he was guilty of gang participation in violation of section 186.22, subdivision (a). We agree.

Section 186.22, subdivision (a) criminally punishes "[a]ny person who actively participates in any criminal street gang with knowledge that its members engage in, or have engaged in, a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang."

Defendant's challenge focuses on the latter half of the statute, which as the California Supreme Court has explained, "requires that [the] felonious criminal conduct be committed by at least two gang members." (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1132; *id.* at p. 1153 ["section 186.22[, subdivision] (a) reflects the Legislature's carefully structured endeavor to punish active participants for commission of criminal acts done *collectively* with gang members"].) According to defendant, the prosecution failed to establish this requirement because, even assuming he was a gang member, it was never established that his companions were also gang members. Nor was it ever established, defendant adds, that either of his companions promoted, furthered, or assisted him in the shooting. For those two reasons, defendant contends the prosecution's offered evidence could not support the conviction under section 186.22, subdivision (a).

Because we find the evidence failed to establish that either of defendant's two companions were gang members, we agree his conviction on this ground cannot stand. As defendant explains, the prosecution offered limited evidence about his two companions and never identified either. Pedro and Esteban told the investigating officers that one or both of defendant's companions wore hats that were all or partly red—a color associated with the Norteño gang. Pedro also testified that both defendant's companions accused the farmworkers of being Sureños and scraps. But the prosecution offered little more about defendant's two companions. In light of the limited evidence, the best the

prosecution's gang expert could say was that "[t]here's a good chance that they were [gang members], but I won't tell you they were without knowing who they are."  The gang expert, in other words, could do no more than speculate that defendant's companions were probably gang members.  But speculation cannot suffice to establish the requirement that the "felonious criminal conduct be committed by at least two gang members."  (*People v. Rodriguez, supra*, 55 Cal.4th at p. 1132; *id.* at p. 1139 [a gang member who commits a felony without support from another gang member does not violate § 186.22, subd. (a)]; see also *People v. Marshall* (1997) 15 Cal.4th 1, 35 ["To be legally sufficient, evidence must be reasonable, credible, and of solid value."]; *People v. Davis, supra*, 57 Cal.4th at p. 360 [" ' "A finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence." [Citation.]' "].)

The Attorney General, in response, acknowledges that section 186.22, subdivision (a) "requires that [the] felonious criminal conduct be committed by at least two gang members," but maintains that defendant's companions were in fact Norteño gang members.  In support, however, the Attorney General cites only to the testimony of one of the officers who originally interviewed Pedro and Esteban.  According to that officer, Pedro and Esteban referred to defendant and his companions as Norteños.  But as defendant notes, neither Pedro nor Esteban was a gang expert, and neither testified he possessed knowledge sufficient to conclude defendant and his companions were Norteño gang members.  Esteban, in fact, told another officer who interviewed him the day of the shooting that he had never before seen defendant and his companions.  And Pedro, although he recognized one of defendant's companions, could only say he had previously seen him "passing by."  We are left then with the limited evidence discussed in the prior paragraph—one or both of defendant's companions wore some red, and both of his companions joined defendant in calling the farmworkers Sureños and scraps.  But on this minimal evidence, even the prosecution's gang expert declined to find the two

17

companions were gang members. We, too, find the evidence insufficient to make this finding.

In the end, the prosecution supplied evidence sufficient to show that only one gang member, defendant, participated in the shooting. Perhaps defendant's companions were gang members too; but considering the limited evidence the prosecution offered, we cannot sustain defendant's conviction under section 186.22, subdivision (a).[6]

V

*The Gang Expert's Testimony*

Defendant next contends the court wrongly allowed the prosecution's gang expert to relate to the jury case-specific hearsay statements that tended to show defendant was a Norteño gang member. The court's doing so, defendant maintains, violated both state hearsay rules and the Sixth Amendment's confrontation clause. Although we agree the court should have excluded some of the expert's testimony, we ultimately find the error harmless beyond a reasonable doubt.

To begin, we agree the prosecution's gang expert related to the jury various hearsay statements—that is, out-of-court statements offered to prove the truth of the matter asserted. Relying on his interviews with several witnesses and his review of police reports and other records, the expert testified that (1) in early 2009 defendant was involved in two after school fights in which the victims were called "scraps," (2) around 2010, a police officer spoke with defendant at a time when he was with two validated gang members, (3) defendant admitted to both the booking officer at juvenile hall and the classification staff at prison that he was a Norteño gang member, (4) defendant, the expert believed, was involved in a fight at juvenile hall where he and others fought

---

[6]     Because we find insufficient evidence in the record to support defendant's gang participation conviction, we need not consider defendant's alternative argument that the jury was wrongly instructed on this count.

18

another inmate they believed was a Sureño, (5) defendant's dot tattoos on his elbows were present at the time of his arrest and tended to show defendant was a Norteño gang member, (6) the Stockton Police Department found defendant was a validated gang member in January of 2011 and, in the expert's opinion, should have done so in August of 2010, and (7) defendant, the expert opined, was an active participant in the Norteño gang at the time of the shooting.

We also agree the admission of at least some of this testimony was inconsistent with state hearsay rules and the confrontation clause. On this score, we note the relevant law has changed since the time of trial. At the time of trial, California Supreme Court precedent generally allowed an expert to rely on otherwise inadmissible hearsay statements to support his or her testimony, and then relate this material to the jury. (See, e.g., *People v. Gardeley* (1996) 14 Cal.4th 605, 618-619, overruled by *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*); *People v. Montiel* (1993) 5 Cal.4th 877, 918-919, overruled by *Sanchez*.) And this was true even when these otherwise inadmissible statements concerned defendant's alleged conduct. (*Gardeley*, at pp. 611-612, 618-619 [gang expert could relate hearsay testimony from one of the defendants' companions for use against them].) Although the court had acknowledged that admitting this type of evidence "may conflict with an accused's interest in avoiding substantive use of unreliable hearsay," it found most "hearsay problems will be cured by an instruction that matters admitted through an expert go only to the basis of his opinion and should not be considered for their truth." (*Montiel*, at p. 919; see *Gardeley*, at pp. 618-619.) And if these problems are not cured by a limiting instruction, the court believed, the proper remedy would be for the accused to seek to exclude the evidence under Evidence Code section 352—a statute allowing courts to "exclude from an expert's testimony any hearsay matter whose irrelevance, unreliability, or potential for prejudice outweighs its proper probative value." (*Montiel*, at p. 919.)

But shortly after the trial here, the high court changed course. In *Sanchez*, *supra*, 63 Cal.4th 665, the court reevaluated an expert's ability to testify about hearsay concerning "case-specific facts"—that is, those facts "relating to the particular events and participants alleged to have been involved in the case being tried." (*Id.* at p. 676.) Overruling its precedent, the court held that "[w]hen any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay" and any resulting hearsay or confrontation concerns cannot be remedied by a limiting instruction. (*Id.* at p. 686 & fn. 13.) Applying these principles, the court found a trial court erred in allowing a gang expert to testify about, among other things, case-specific facts about the defendant and his companions that the expert learned through his review of police reports. (*Id.* at pp. 694-695.)

Under the same logic as *Sanchez*, we agree that at least some of the gang expert's testimony here should have been excluded, as it was based on case-specific out-of-court statements. We also agree, as defendant contends and our Supreme Court recently held, that defendant's counsel did not forfeit this issue by failing to raise it at trial. (*People v. Perez* (2020) 9 Cal.5th 1, 4 [the defendants do not forfeit "a claim that a gang expert's testimony related case-specific hearsay in violation of the confrontation clause" if they failed to object to the testimony at trial before *Sanchez* was decided].) But even so, we find any error in the admission of this evidence harmless beyond a reasonable doubt.

Although defendant contends the expert's testimony was prejudicial because it tended to show defendant was a Norteño gang member, independent evidence overwhelmingly showed the same. The juvenile hall booking officer, most importantly, testified that defendant admitted he was a Norteño gang member after she asked whether

20

he was affiliated with a gang.[7]  That alone is powerful evidence of defendant's gang affiliation.  As the United States Supreme Court has noted, a " 'defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.' "  (*Arizona v. Fulminante* (1991) 499 U.S. 279, 296; see also *People v. Bradford* (2008) 169 Cal.App.4th 843, 855 ["A confession is uniquely powerful evidence"].)

Other witnesses also offered testimony tending to show defendant was a Norteño gang member.  Esteban, who identified defendant as the shooter at trial, testified that defendant questioned whether the farmworkers were Sureño gang members and then accused them of being "scraps"—again, a derogatory term that Norteño gang members use for Sureño gang members.  Pedro offered similar statements, though he was less certain about the shooter's identity by the time of trial.  Unlike Esteban, Pedro did not recognize defendant at trial and said he remembered little of the shooting, which had occurred over two years before.  But in the days after the shooting, when his memory of the event was firmer, Pedro identified defendant as the shooter after viewing a six-person photo array that included defendant.  Pedro then at trial, like Esteban, testified that the shooter asked if he and his companions were Sureños and then called them "scraps" before opening fire—language tending to suggest the shooter was a Norteño gang member.  Finally, although defendant objects to the gang expert's testimony about defendant's dot tattoos on his elbows, another witness testified to the same without objection.  The detective who arrested defendant testified that, at the time of the arrest, defendant had four dots tattooed on one elbow and one dot tattooed on the other.  The gang expert afterward, consistent with *Sanchez*, *supra*, 63 Cal.4th 665, explained the

---

[7]  Although defendant claims the court erred in allowing this testimony, as discussed in part III of the Discussion above, defendant forfeited this argument by failing to raise it at trial.

21

meaning of these tattoos. (See *id.* at pp. 675-676 [although experts cannot relate case-specific out-of-court statements, they can relate general knowledge in their field of expertise, even if technically hearsay].) According to the gang expert, tattoos of the type defendant had on his elbows suggest Norteño gang membership.

Considering this evidence, we find any error in the admission of the gang expert's testimony harmless. Confrontation clause violations are subject to federal harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18—that is, violations of this type require reversal unless the reviewing court finds the error harmless beyond a reasonable doubt. (*People v. Lopez* (2012) 55 Cal.4th 569, 585.) We find that standard satisfied here in light of the overwhelming independent evidence supporting the finding that defendant was a Norteño gang member.

VI

*Proposition 57 and* Franklin *Hearing*

Defendant, in his first supplemental brief, raises several claims relating to his youth at the time of the shooting. First, defendant claims he is entitled to a remand in light of Proposition 57—a proposition that bars prosecutors from charging juveniles in criminal (or adult) court unless a juvenile court first agrees to transfer the matter to adult court. Although Proposition 57 passed after defendant's trial, defendant contends it applies retroactively and requires a remand here to allow a juvenile court to consider whether his case should remain in juvenile court or be transferred to adult court. Second, in the event we decline to remand for this purpose and affirm the judgment against him, defendant asserts he is then entitled to a limited remand to allow him to make a record of mitigating evidence relevant to his eventual youth offender parole hearing.

We address first defendant's Proposition 57 claim.

Defendant was charged for crimes committed when he was 16 years old, and as allowed by the law at the time, the prosecution charged defendant directly in adult court. (*People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 303 (*Lara*).) But with the

22

passage of Proposition 57 in November of 2016, prosecutors no longer can criminally charge a juvenile directly in adult court. (*Lara*, at p. 303.) Rather, under current law, they must now begin the action in juvenile court. (*Ibid.*) If they seek to try the juvenile as an adult, prosecutors must first file a motion with the juvenile court requesting a transfer of the matter to adult court. (Welf. & Inst. Code, § 707, subd. (a).) Only if the juvenile court agrees to transfer the matter to adult court can the juvenile be tried and sentenced as an adult. (*Ibid.*)

The question here is whether this part of Proposition 57 applies retroactively to benefit defendant. Although this question was perhaps debatable at the time of briefing, it is now easily answered. Considering this very issue in *Lara, supra*, 4 Cal.5th 299, the California Supreme Court found "this part of Proposition 57 applies to all juveniles charged directly in adult court whose judgment was not final at the time it was enacted." (*Lara*, at p. 304.) Under that ruling, we find defendant is retroactively entitled to a transfer hearing under Proposition 57 and remand for that purpose.

We turn next to defendant's claim concerning his eventual "youth offender parole hearing"—a hearing most youth offenders are eligible to receive if convicted of an offense carrying a sentence of over 15 years. Although defendant, in his briefing, suggested this claim would become irrelevant if we remanded to allow a transfer hearing under Proposition 57, that is not necessarily true. Should the juvenile court transfer his case to adult court and he then receive another life sentence, defendant's claim about his eventual youth offender parole hearing would certainly be relevant then. We thus briefly address the issue.

Under section 3051, subdivision (b), the Board of Parole Hearings generally must conduct a "youth offender parole hearing" during the 15th, 20th, or 25th year of a juvenile offender's incarceration. (§ 3051, subd. (b).) The year of the hearing depends on the offender's "controlling offense," which is defined as "the offense or enhancement for which any sentencing court imposed the longest term of imprisonment." (*Id.*, subd.

23

(a)(2)(B).)  Juvenile offenders are entitled to a youth offender parole hearing during (1) the 15th year of incarceration if the sentence for the controlling offense is a determinate term over 15 years, (2) the 20th year of incarceration if the sentence for the controlling offense is a life term of less than 25 years to life, and (3) the 25th year of incarceration if the sentence for the controlling offense is a life term of 25 years to life or greater.  (*Id.*, subd. (b)(1)-(3).)

Although the California Legislature enacted this law after the trial here, youth offenders like defendant are eligible for these parole hearings "regardless of the date of conviction."  (*Franklin*, *supra*, 63 Cal.4th at p. 278.)  To ensure an adequate record at these hearings, youth offenders are entitled to make a record of mitigating evidence tied to their youth at the time of their sentencing hearings or, if their sentence was imposed before the law allowed "youth offender parole hearings," at a reasonable time afterward.  (See *id.* at pp. 268-269.)  As the court in *Franklin* explained, assembling this mitigating evidence is "typically a task more easily done at or near the time of the juvenile's offense rather than decades later when memories have faded, records may have been lost or destroyed, or family or community members may have relocated or passed away."  (*Id.* at pp. 283-284.)

Applying this framework in *Franklin*, the California Supreme Court found the youth offender there—who, like defendant, was sentenced before section 3051's enactment—was entitled to a limited remand because "[i]t [wa]s not clear whether [the defendant] had sufficient opportunity to put on the record the kinds of information that sections 3051 and 4801 deem relevant at a youth offender parole hearing."  (*Franklin*, *supra*, 63 Cal.4th at p. 284.)  The court thus remanded the matter to the trial court to determine whether [the defendant] "was afforded sufficient opportunity to make a record of information relevant to his eventual youth offender parole hearing."  (*Ibid.*)  And if the trial court found he was not, the high court explained, the trial court must then allow [the defendant] to place "on the record any documents, evaluations, or testimony (subject to

24

cross-examination) that may be relevant at his eventual youth offender parole hearing, and the prosecution likewise may put on the record any evidence that demonstrates the juvenile offender's culpability or cognitive maturity, or otherwise bears on the influence of youth-related factors." (*Ibid.*)

We find a similar examination appropriate here—at least to the extent defendant, after remand to the juvenile court, is transferred to adult court and sentenced to a term that warrants an eventual youth offender parole hearing. (See part VII of the Discussion, *post*.) In that event, consistent with *Franklin*, the trial court must evaluate whether defendant had sufficient opportunity in earlier hearings to present mitigating evidence relevant to his eventual youth offender parole hearing; and if the court finds he did not, it must afford defendant an opportunity to provide this type of evidence.

VII

*Firearm Enhancements*

Defendant, in his second supplemental brief, contends we should remand to allow the trial court to exercise its newly granted discretion under section 12022.53 to strike firearm enhancements.

The California Legislature amended section 12022.53, subdivision (h), effective January 1, 2018, to give the trial court discretion to strike, in the interest of justice, a firearm enhancement imposed under that statute. (See Sen. Bill No. 620 (2017-2018 Reg. Sess.), Stats. 2017, ch. 682; *People v. Billingsley* (2018) 22 Cal.App.5th 1076, 1079-1080.)

Although this amendment became effective well after defendant's trial, we agree, as defendant contends and our Supreme Court recently found, that it applies retroactively to defendant and other defendants whose sentences are not yet final. (See *People v. Flores* (2020) 9 Cal.5th 371, 431 [agreeing with the Attorney General that § 12022.53, subd. (h) applies retroactively].) Defendant is thus entitled to the potential benefit offered by section 12022.53, subdivision (h) on remand.

VIII

*Fees and Fines*

Finally, in his third supplemental brief, defendant contends the trial court violated his due process rights by ordering him to pay criminal fees and fines without first finding he had the ability to pay these amounts.

In addition to sentencing defendant to prison for a term of 40 years to life, the trial court ordered defendant to pay various fees and fines:  a $120 court assessment fee ($40 per count, § 1465.8), a $90 criminal conviction assessment fee ($30 per count, Gov. Code, § 70373), and a $10,000 restitution fine (Gov. Code, § 1202.4, subd. (b)).  But the court never held a hearing to determine if defendant could pay these amounts, and defendant now takes issue with the court's failure to do so, relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157.  According to the court in *Dueñas*, a trial court cannot impose the fees described in section 1465.8 and Government Code section 70373 unless the court first holds an ability to pay hearing and concludes the defendant is able to pay the fees.  (*Dueñas,* at p. 1164.)  And, the *Dueñas* court went on, although a trial court may impose the restitution fines described in section 1202.4, subdivision (b) without considering ability to pay, it must stay the execution of that fine until it holds an ability to pay hearing and concludes the defendant is able to pay the fine.  (*Dueñas,* at p. 1164.) The court found these safeguards necessary because the imposition of these fees and fines on indigent defendants would raise serious due process concerns.  (*Id.* at pp. 1168, 1172.)

Because we find remand appropriate for other reasons, we need not address the merits of this type of argument today.  Should, following remand, the juvenile court transfer this matter to adult court, defendant can raise at that time his argument about his ability to pay fees and fines.

DISPOSITION

We conditionally reverse the judgment.  We remand the matter to the trial court with directions to transfer the case to the juvenile court.  The juvenile court is then to

26

determine whether the matter should remain in juvenile court or be transferred to adult court.

Should the juvenile court find the case should remain within the juvenile justice system, defendant's convictions—apart from those we reverse in parts II and IV of the Discussion of our opinion—will be deemed juvenile adjudications. The juvenile court is then to consider whether to strike or dismiss defendant's firearm enhancements and impose an appropriate disposition within its discretion under juvenile court law.

Should the juvenile court instead transfer the matter to adult court, defendant's convictions—apart from those we reverse in parts II and IV of the Discussion of our opinion—will be reinstated. The court is then to consider whether to strike or dismiss defendant's firearm enhancements and resentence defendant within the bounds of its discretion. In the event the court sentences defendant to a term that warrants an eventual youth offender parole hearing, it must evaluate whether defendant had sufficient opportunity in earlier hearings to present mitigating evidence relevant to his eventual youth offender parole hearing; and if the court finds he did not, it must afford defendant an opportunity to provide this type of evidence.

/s/<br>
BLEASE, Acting P. J.

We concur:


/s/<br>
HULL, J.


/s/<br>
MAURO, J.

27